UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL O'CONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 2291 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CONTINENTAL ELECTRICAL CONSTRUCTION | ) | |
| COMPANY and JOHN KUTA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michael O'Connell brought this lawsuit against his former employer,

Continental Electrical Construction Company, and his former supervisor, John Kuta, alleging

discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq*., and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*.,

and asserting common law claims for retaliatory discharge and intentional infliction of emotional

distress. When Defendants moved to dismiss the initial complaint pursuant to Federal Rule of

Civil Procedure 12(b)(6), O'Connell filed an amended complaint. Defendants then moved to

dismiss the amended complaint under Rule 12(b)(6), and this time O'Connell has stood on his

pleading. Defendants' motion is granted with respect to the ADA discrimination claim, the

retaliatory discharge claim, and the IHRA claim, and it is denied with respect to the ADA

retaliation claim and the emotional distress claim.

## Background

The well-pleaded facts alleged in the amended complaint are assumed true on a Rule 12(b)(6) motion. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). Also pertinent at the Rule 12(b)(6) stage are exhibits attached to the amended complaint, *see* Fed. R. Civ. P. 10(c); *Witzke v. Femal*, 376 F.3d 744, 749 (7th Cir. 2004), and exhibits attached to the parties' briefs that are "referred to" in the complaint and "central to [O'Connell's] claim," *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994). *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). To the extent an exhibit contradicts the complaint's allegations, the exhibit takes precedence. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The following facts are set forth as favorably to O'Connell as permitted by the amended complaint and the relevant exhibits.

In 2003, O'Connell began to suffer from severe anxiety and depression and was prescribed anti-anxiety medication. Doc. 25 at ¶¶ 13, 55, 70, 90, 100. In June 2007, O'Connell informed Continental that he suffered from cancer and had undergone surgery to remove a testicle and a malignant tumor from his neck, with the neck surgery leaving a visible scar on his throat. *Id*. at ¶¶ 16-20, 51-54, 91-94. Kuta, who was one of O'Connell's supervisors, began to ridicule O'Connell in front of others by calling him "uni-ball" and "cut throat" and asking if he had "an Italian neck tie" or if he was giving customers a "cut throat" price. *Id*. at ¶¶ 22-25, 57-59, 96-99. Kuta's comments aggravated O'Connell's anxiety and depression, causing him to keep anti-anxiety medication in his desk drawer, which Kuta would remove. *Id*. at ¶¶ 26-27, 70-71, 74-75, 100-101. The harassment, which Kuta knew aggravated O'Connell's anxiety and depression, made it difficult for O'Connell to function at work and at home. *Id*. at ¶¶ 30-33, 69,

78, 102.  O'Connell complained about the harassment to David Wirtz, Continental's owner, and to Joe Bartucci, another supervisor.  *Id*. at ¶¶ 34, 37, 60, 63, 104, 106.  Neither Wirtz nor Bartucci reprimanded Kuta or took any action to prevent further harassment.  *Id*. at ¶¶ 35, 38, 61, 64, 105, 107.

In April 2009, O'Connell scored 4.7 out of 6.0 on an employment evaluation and was not informed of any performance issues.  *Id*. at ¶¶ 41, 67, 112.  Shortly thereafter, in late April or early May, O'Connell again complained to Continental's management about Kuta's continued harassment.  *Id*. at ¶¶ 45, 67, 112.  O'Connell was fired on May 14, 2009 for what Continental claimed were "performance deficiencies."  *Id*. at ¶¶ 46, 68, 113.  O'Connell "believes he was terminated as a result of his continued request to be treated fairly, given the impact of the harassment on his anxiety, depression, and mental health."  *Id*. at ¶¶ 47, 114-115, 118.

After being terminated, O'Connell filed an administrative charge of discrimination with the Equal Opportunity Employment Commission ("EEOC").  *Id*. at ¶¶ 48, 155; Doc. 34-1 (noting that O'Connell's charge was filed with the EEOC).  The charge stated:

> I began my employment with [Continental] on June 6, 1996.  My current position is Assistant Service Manager.  Since June of 2007, [Continental] has been aware of my disability.  During my employment with [Continental], I have been subjected to harassing comments about my disability.  I complained to [Continental] about the harassing comments to no avail.
>
> I believe I have been discriminated against because of my disability and retaliated against for engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

Doc. 30-2.  On November 10, 2009, the Illinois Department of Human Rights ("IDHR") wrote O'Connell a letter acknowledging that he had filed his charge with the EEOC; informing him that

he could proceed with the charge at the IDHR; cautioning him that if he wished to proceed at the

IDHR, he had to notify the IDHR within thirty-five days of receiving the letter; further cautioning

him that his failure to so notify the IDHR would result in the IDHR closing his file; and assuring

him that his decision whether to proceed before the IDHR would not affect the EEOC's

processing of his charge. Doc. 34-1. The complaint does not allege that O'Connell notified the

IDHR that he wished to proceed before the IDHR, and O'Connell's brief implicitly concedes that

no such notification was given. Doc. 34 at 11-13. Eventually, O'Connell received a right to sue

letter from the EEOC. Doc. 25 at ¶¶ 48, 160. This lawsuit was filed less than ninety days later,

on April 5, 2011. *Ibid*.

## Discussion

### I. ADA Claims

The ADA prohibits discrimination against "a qualified individual on the basis of

disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). To state an ADA discrimination claim, O'Connell must

allege that he has a "disability." *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688-89 (7th Cir.

2010); *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999). The ADA defines

"disability" as "a physical or mental impairment that substantially limits one or more major life

activities," "a record of such impairment," or "being regarded as having such an impairment." 42

U.S.C. § 12102(1). The amended complaint attempts to ground O'Connell's ADA

discrimination claim on two disabilities, the first being cancer, and the second being anxiety and

depression. Defendants argue, correctly, that neither disability can support that claim.

With respect to cancer, Defendants contend that because the amended complaint does not plausibly allege that O'Connell's cancer limited any major life activities, it does not state an ADA discrimination claim based on cancer.  O'Connell's brief does not respond to this contention.  As the Seventh Circuit has warned, when a plaintiff is "presented with a motion to dismiss, [he] must proffer some legal basis to support his cause of action.  The federal courts will not invent legal arguments for litigants." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995) (internal citations omitted); *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court.  We apply that rule where a party fails to develop arguments related to a discrete issue … .") (citations omitted); *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007).  O'Connell therefore has forfeited any argument that his cancer qualifies as a "disability" sufficient to support his ADA discrimination claim.

With respect to anxiety and depression, Defendants contend that O'Connell failed to exhaust an ADA claim based on that disability because his administrative charge did not reference it.  A plaintiff generally cannot bring in federal court an ADA claim that the plaintiff did not raise in an administrative charge.  *See Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir. 1985).  This exhaustion rule "serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employee some warning of the conduct about which the employee is aggrieved. … For allowing the complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's

investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (internal citations omitted).

Although the factual basis for a discrimination claim must have been presented in an administrative charge, "because most EEOC charges are completed by laypersons rather than by lawyers, a … plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Ibid*. Instead, the court asks whether the federal claim is "like or reasonably related to the allegations of the [administrative] charge and grow[s] out of such allegations" or, put another way, whether "there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Ibid*. (internal quotation marks omitted). General allegations of discrimination in an administrative charge are not a sufficient predicate for bringing any discrimination claim in federal court. As the Seventh Circuit explained by way of example:

> Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination. The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*.

*Id*. at 501.

O'Connell does not respond to Defendants' submission that his administrative charge did not fairly encompass an ADA discrimination claim grounded on anxiety and depression, resulting in another forfeiture. *See Alioto*, 651 F.3d at 721; *Wojtas*, 477 F.3d at 926; *Stransky*, 51 F.3d at 1335. The only passage in O'Connell's brief that even *remotely* touches on exhaustion

can be found in a section addressing Defendants' (meritless) argument that the ADA claim is barred by the statute of limitations. There, O'Connell asserts that during a December 2009 mediation before the EEOC, he articulated his "position … that the conduct of Defendant affected Plaintiff psychologically to the point where Plaintiff went to sleep immediately after returning home from work." Doc. 34 at 2. O'Connell does not and could not explain how making that statement during a mediation would have apprised Defendants or the EEOC that he was alleging ADA discrimination based on a disability consisting of anxiety and depression.

Forfeiture aside, O'Connell's administrative charge plainly does not encompass a discrimination claim based on anxiety and depression. The charge states that "[s]ince June of 2007, Respondent has been aware of my disability" and that "I have been subjected to harassing comments about my disability." Doc. 30-2. The amended complaint makes clear that "disability" referenced in the charge is cancer, not anxiety and depression. Keying in on the June 2007 time frame referenced in the administrative charge, the amended complaint alleges that "[i]n or around June of 2007, Plaintiff conveyed to Defendant Continental that he suffered from a form of Cancer and other serious medical conditions," that "after June of 2007, Defendant Continental became aware that Plaintiff suffered the surgical removal of one testicle," and that "after June of 2007, Defendant Continental became aware that Plaintiff suffered a surgery on or near his neck to remove a malignant melanoma, which left Plaintiff with a visible scar on his throat." Doc. 25 at ¶¶ 16, 19-20. Given this, O'Connell could not plausibly have argued that the "disability" (singular, not plural) referenced in the administrative charge was anxiety and depression, as opposed or in addition to cancer. Because the charge grounded O'Connell's discrimination claim on cancer, he cannot proceed in court with a claim based on the unrelated

disability of anxiety and depression. *See MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (rejecting depression as the predicate of the plaintiff's ADA claim where the EEOC charge referenced only coronary artery disease); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1355-56 & n.7 (S.D. Fla. 1999) (same where the EEOC charge referenced only physical disabilities); *Moore v. City of Overland Park*, 950 F. Supp. 1081, 1086 (D. Kan. 1996) (rejecting nicotine addition and central nervous disorder as predicates for the plaintiff's ADA claim where the EEOC charge referenced only diabetes).

The dismissal of O'Connell's ADA discrimination claim leaves his ADA retaliation claim, which alleges that Defendants retaliated against him for complaining about disability discrimination. The ADA prohibits retaliation, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). Because the ADA "prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim," "[t]he fact that [O'Connell] is not disabled under the ADA," while dooming his discrimination claim, "is not fatal to his retaliation claim." *Turner*, 595 F.3d at 690 (internal quotation marks omitted).

The amended complaint alleges that O'Connell received a good performance evaluation in early April 2009, that he complained in late April or early May 2009 that Kuta continued to harass him based on the physical effects of his cancer surgeries, and that he was fired in mid-May due to those complaints. That properly states a retaliation claim. *See Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (holding that an "informal complaint may constitute protected activity for the purposes of [ADA] retaliation claims" and that suspicious timing can

-8-

create a triable issue of fact on causation). The claim is adequately set forth in O'Connell's administrative charge, which alleges that he complained to Continental about disability-related harassment and that he was fired as a result. *See Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 478 (7th Cir. 1999). It follows that O'Connell's ADA retaliation claim survives dismissal.

## II.    Intentional Infliction of Emotional Distress Claim

To state a claim for intentional infliction of emotional distress, O'Connell must plead (1) that the defendant's conduct was "truly extreme and outrageous"; (2) that the defendant "either *intend[ed]* that his conduct inflict severe emotional distress, or [knew] that there [was] at least a high probability that his conduct [would] cause severe emotional distress"; and (3) that the defendant's conduct "in fact cause[d] *severe* emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 79-80 (Ill. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)); *see also Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008). "Liability does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions or trivialities.'" *Thomas v. Fuerst*, 803 N.E.2d 619, 625 (Ill. App. 2004) (quoting *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)); *see also Lewis*, 523 F.3d at 746-47. Rather, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Thomas*, 803 N.E.2d at 625 (quoting *Pub. Fin. Corp.*, 360 N.E.2d at 767); *see also Lewis*, 523 F.3d at 747.

Defendants argue that the conduct underlying O'Connell's emotional distress claim is not "extreme and outrageous." It is true that much of Kuta's conduct consisted of unactionable insults and indignities. However, Kuta's removal of O'Connell's anti-anxiety medication from his desk drawer may properly be deemed "extreme and outrageous" conduct, particularly given

Kuta's position of authority over O'Connell and Kuta's knowledge of O'Connell's fragile mental state. *See Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) ("An important factor … is whether a defendant abused a position of authority."); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211-13 (Ill. 1992) (allegations that a radio host publicly ridiculed a family that suffered from a disfiguring disease stated a claim for intentional infliction of emotional distress because the host knew of the plaintiffs' susceptibility to emotional distress); *McGrath*, 533 N.E.2d at 811 ("Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.").

Defendants next argue that O'Connell's emotional distress claim is preempted by the IHRA and the Illinois Worker's Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq*. The IHRA preempts common law tort claims in some circumstances. *See Mendez v. Perla Dental*, 646 F.3d 420, 421-22 (7th Cir. 2011); *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997); *Geise v. Phoenix Co. of Chi.*, 639 N.E.2d 1273, 1277 (Ill. 1994). The preemption inquiry turns "not [on] whether the facts that support [the plaintiff's tort claim] could also have supported a discrimination claim, but instead [on] whether [the plaintiff] can prove the elements of [the tort claim] independent of legal duties furnished by the IHRA." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). O'Connell's allegation that Kuta removed O'Connell's medication from his desk drawer states an emotional distress claim independent of the duties imposed by the IHRA. *See Kolegas*, 607 N.E.2d at 211-13. It follows that there is no IHRA preemption of that claim. *See Naeem*, 444 F.3d at 605.

Nor is there preemption under the IWCA.  IWCA preemption is not possible for the claim against Kuta.  *See Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1230 (Ill. 1990) (holding that the IWCA "do[es] not bar employees from pursuing a common law action against co-employees for injuries arising out of intentional torts").  Preemption is theoretically available for the claim against Continental.  "The IWCA is an employee's exclusive remedy for 'accidental' injuries arising out of and in the course of employment."  *McPherson v. City of Waukegan*, 379 F.3d 430, 442 (7th Cir. 2004).  The Illinois Supreme Court has held that the IWCA "bar[s] an employee from bringing a common law cause of action against his … employer unless the employee-plaintiff proves: (1) that the injury was not accidental; (2) that the injury did not arise from his … employment; (3) that the injury was not received during the course of employment; or (4) that the injury [is] not compensable under the Act."  *Meerbrey*, 564 N.E.2d at 1226; *see also Dunlap v. Nestle USA, Inc.*, 431 F.3d 1015, 1016 (7th Cir. 2005).

O'Connell pursues the first route, arguing that the emotional distress he suffered was "not accidental."  As a general rule, "injuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the [IWCA], since such injuries are unexpected and unforeseeable from the injured employee's point of view" and also "from the employer's point of view, at least where the employer did not direct or expressly authorize the co-employee to commit the assault."  *Meerbrey*, 564 N.E.2d at 1226; *see also McPherson*, 379 F.3d at 442.  But there is an exception to the general rule where the employer has "committed, commanded, or expressly authorized" the other employee's tortious conduct against the plaintiff.  *McPherson*, 379 F.3d at 443; *see also Meerbrey*, 564 N.E.2d at 1226 (exception applies "for injuries which the employer or its alter ego intentionally inflicts upon an employee or which were commanded

or expressly authorized by the employer"); *Corcoran v. City of Chi.*, 2011 WL 2110264, at *3 (N.D. Ill. May 25, 2011).

The amended complaint attempts to invoke that exception by claiming that Continental "condoned and authorized" Kuta's conduct. Doc. 25 at ¶¶ 65, 68, 79. To support that claim, the amended complaint alleges that O'Connell complained to Continental's management about Kuta's inappropriate behavior and its effect on his mental health, and that Continental responded not by taking action against Kuta or removing him from his supervisory position over O'Connell, but by firing O'Connell. *Id*. at ¶¶ 60-79. Some decisions from this District hold or suggest that allegations like these are insufficient to show that the employer commanded or expressly authorized the co-worker's conduct. *See Sacramento v. City of Chi.*, 2010 WL 2740305, at *12 (N.D. Ill. July 12, 2010) (supervisor's knowledge of harassing conduct did not show the employer's express authorization of the conduct); *Scott-Riley v. Mullins Food Prods, Inc.*, 2004 WL 1557817, at *1 (N.D. Ill. July 7, 2004) ("a claim that management ignored evidence that the conduct was taking place is insufficient"); *Fortenberry v. United Air Lines*, 1997 WL 457499, at *5 (N.D. Ill. Aug. 7, 1997) (the employer "cannot be said to have specifically commanded or expressly authorized the intentional torts of co-workers simply because it knew or should have known that [a co-worker] was harassing [the plaintiff]"); *Lee v. Paper Grp. Holding*, 1996 WL 507294, at *3 (N.D. Ill. Sept. 5, 1996) (allegations demonstrating management's knowledge of conduct and failure to prevent it "indicate[d] that management *implicitly* authorized the conduct, … [not] that management *expressly* authorized the conduct"); *Wood v. Ill. Bell. Tel. Co.*, 1994 WL 194228, at *2-3 (N.D. Ill. May 16, 1994) ("there must be allegations of direction, encouragement or participation in the harassment by [the employer]; allegations of implicit

approval or acquiescence do not suffice"); *Jaskowski v. Rodman & Renshaw, Inc.*, 813 F. Supp. 1359, 1362-63 (N.D. Ill. 1993) (allegations that the company's president was notified about ongoing sexual harassment were insufficient to establish the company's express authorization of the conduct). Other cases, exemplified by *Thomas v. Habitat Co.*, 213 F. Supp. 2d 887 (N.D. Ill. 2002), hold that "management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct." *Id*. at 892; *see also Lujano v. Town of Cicero*, 691 F. Supp. 2d 873, 888 (N.D. Ill. 2010) ("Many courts in this District have held that employer inaction [in the face of knowledge of employee misconduct] is tantamount to authorization of the employee's conduct and is a legitimate basis for holding the employer responsible.") (citing cases); *Ciesielski v. Hooters of Am., Inc.*, 2004 WL 1699020, at *6 n.10 (N.D. Ill. July 28, 2004) ("A plaintiff can show that the injury was not 'accidental' where the employer stands idly by rather than attempting to prevent known harassment."); *Quela v. Payco-Gen. Am. Credits, Inc.*, 84 F. Supp. 2d 956 (N.D. Ill. 2000) ("Courts have recognized that management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct.") (citing cases); *Cline v. Gen. Elec. Capital Auto Lease, Inc.*, 757 F. Supp. 923, 931 (N.D. Ill. 1991) (holding that the employer "'authorized' [the co-worker's] battery of [the plaintiff] by failing to prevent assaults it was reasonably aware he was committing").

Only if the *Thomas* line of cases is correct can O'Connell's emotional distress claim survive IWCA preemption. The parties have not cited, and the court has not found, any Illinois Supreme Court precedent speaking directly to the issue. But the Seventh Circuit provided guidance in *McPherson*. The plaintiff in *McPherson* sued her employer for intentional infliction of emotional distress, alleging that she was subjected to harassment by her supervisor and forced

-13-

to resign; the employer argued that the emotional distress claim was preempted by the IWCA. Citing *Meerbrey*, the Seventh Circuit recognized that the plaintiff could avoid IWCA preemption by showing that the employer "has committed, commanded, or expressly authorized" her supervisor's conduct. 379 F.3d at 443. The plaintiff argued that she could meet this standard "because management knew that [the supervisor] was making comments about the color of the female office workers' bras and did nothing, thus expressly authorizing his actions and creating an environment in which those actions were permitted to escalate." *Ibid*. At this point in the opinion, the Seventh Circuit cited *Thomas* for the proposition that "management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct." *Ibid*. (quoting *Thomas*, 213 F. Supp. 2d at 892). The court then rejected the plaintiff's argument that the employer expressly authorized the supervisor's actions, explaining that the employer "was not aware of [the supervisor's] sexually harassing behavior until March 27, 2001, at which point it acted promptly and effectively to rectify the situation." *Ibid*. The Seventh Circuit concluded that "[b]ecause the [employer] took action immediately upon receiving [the plaintiff's] complaint and because the [employer] could not have known any earlier that [the supervisor] posed a risk to [the plaintiff], summary judgment in favor of the [employer] on this claim was proper." *Ibid*.

Although *McPherson* ruled that the plaintiff's emotional distress claim was preempted by the IWCA—because the employer there, unlike Continental here, took action immediately upon learning of the supervisor's misconduct—the Seventh Circuit cited *Thomas* favorably and proceeded to distinguish it. If the Seventh Circuit did not accept *Thomas*, a non-precedential district court decision, as correctly stating the law, why cite and quote it, only then to distinguish

it?  *McPherson* provides the strongest indication of where the Seventh Circuit stands, and this court is obligated to fall in line.  *See Luna v. United States*, 454 F.3d 631, 636 (7th Cir. 2006); *Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993).  Under *Thomas*, and thus under *McPherson*, Continental's IWCA preemption argument must be rejected.

## III.   Retaliatory Discharge Claim

Illinois is an at-will employment state, meaning that, as a general rule, "an employer may discharge an employee … for any reason or for no reason."  *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009) (internal quotation marks omitted); *see also Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 940 (7th Cir. 2002).  The retaliatory discharge tort carves a "limited and narrow" exception to the general rule.  *Turner*, 911 N.E.2d at 374.  "To state a valid retaliatory discharge cause of action, an employee must allege that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy."  *Ibid*.; *see also Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009); *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 628 (7th Cir. 2009).

To adequately support a retaliatory discharge claim, the public policy invoked by a plaintiff must "strike at the heart of a citizen's social rights, duties, and responsibilities."  *Turner*, 911 N.E.2d at 374 (internal quotation marks omitted).  Public policy may "be found in the State's constitution and statutes and, when they are silent, in its judicial decisions," *ibid*. (internal quotation marks omitted), and also in federal law, *see Wheeler v. Caterpillar Tractor Co.*, 485 N.E.2d 372, 377 (Ill. 1985); *Brandon*, 277 F.3d at 942-43.  "The public policy requirement is not met when only private interests are at stake."  *Benders v. Bellows & Bellows*, 515 F.3d 757, 766 (7th Cir. 2008) (internal quotation marks omitted).  "Illinois courts have identified two situations

in which the 'clear mandate of public policy' standard is met: (1) when an employee is fired for asserting a workers' compensation claim; and (2) when an employee is fired for refusing to engage in illegal conduct or reporting the illegal conduct of others ('whistle blowing' or 'citizen crime fighting')." *Brandon*, 277 F.3d at 941 (internal quotation marks omitted). "The Illinois Supreme Court has defined 'public policy' only within these limited bounds and thus has consistently sought to restrict the common law tort of retaliatory discharge." *Darchak*, 580 F.3d at 629 (internal quotation marks omitted). Illinois law "does not require the employee to have been correct about the unlawfulness of the [employer] conduct" about which he complained, as long as he "had a good-faith belief that it was unlawful," *Brandon*, 277 F.3d at 941; *see also Benders*, 515 F.3d at 766, and as long as his good-faith belief was "objectively reasonable," *Lang v. Northwestern Univ.*, 472 F.3d 493, 495 (7th Cir. 2006).

To properly plead a retaliatory discharge claim, a plaintiff must articulate the relevant public policy with specificity. The Supreme Court of Illinois emphasized this point numerous times in *Turner*, holding that "[a] broad, general statement of policy is inadequate to justify finding an exception to the general rule of at-will employment"; that "[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice" is insufficient; that "unless an employee at will identifies a specific expression of public policy, the employee may be discharged with or without cause"; that "[a]n employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations"; and that "unless an employee at will identifies a 'specific' expression of public policy, the employee may be discharged at will." 911 N.E.2d at 375-76 (internal quotation marks omitted). *Turner* noted that insufficiently specific "allegations

of public policy include 'right to marry' a coworker; 'product safety'; 'promoting quality health care'; and 'the Hippocratic Oath.'" *Id*. at 376 (internal citations omitted). Another insufficiently specific allegation is "the general purpose declaration of the No Child Left Behind Act: 'that all children have a fair, equal, and significant opportunity to obtain a high-quality education.'" *Darchak*, 580 F.3d at 629. As these examples illustrate, "the mere citation of a constitutional or statutory provision in a complaint will not, by itself, be sufficient to state a cause of action for retaliatory discharge. Rather, an employee must show that the discharge violated the public policy that the cited provision clearly mandates." *Turner*, 911 N.E.2d at 377.

Here, the amended complaint's retaliatory discharge claim rests on the allegation that O'Connell was fired in retaliation for complaining to Continental management about Kuta's disability-based harassment. The amended complaint cites two sources of public policy: (1) the ADA, "which is designed to protect workers with disabilities," and (2) the "public policy … directly aimed at ensuring a Plaintiff mitigates damages" by taking action to stop conduct that is harming "his mental and physical well-being." Doc. 25 at ¶¶ 115-117. Neither public policy is sufficient to support the claim, which accordingly is dismissed.

In the portion of his brief addressing the retaliatory discharge claim (Doc. 34 at 6-7), O'Connell does not mention the ADA, and thus has forfeited any argument that the claim can be grounded on public policy expressed in the ADA. *See Alioto*, 651 F.3d at 721; *Wojtas*, 477 F.3d at 926; *Stransky*, 51 F.3d at 1335. The argument would have failed in any event. A significant factor in deciding whether a retaliatory discharge claim will lie in a given case is whether a statutory anti-retaliation provision provides an alternative remedy for the discharge. *See Brandon*, 277 F.3d at 945 ("even if there is some kind of federal remedy available under" a

statutory anti-retaliation provision, "it appears that the Illinois Supreme Court looks at" the availability of an alternative remedy "as one of many factors in the pragmatic approach toward determining when the tort of retaliatory discharge will lie"); *Stebbings v. Univ. of Chi.*, 726 N.E.2d 1136, 1141 (Ill. App. 2000) ("a court might even be obligated to dismiss" a retaliatory discharge claim if there was already "a statute making [the plaintiff's] firing illegal," as "one of the factors that a court considers in deciding whether to allow a retaliatory discharge claim is the existence of an adequate alternative remedy"); *Emery v. Ne. Ill. Regional Commuter R.R. Corp.*, 2003 WL 22176077, at *6 (N.D. Ill. Sept. 18, 2003) (finding it "unlikely that Illinois courts would extend the narrow tort of retaliatory discharge to encompass a claim … where [the plaintiff] has an adequate alternative remedy" under the anti-retaliation provisions of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*). Here, as shown above, the ADA's anti-retaliation provision provides him with a remedy for the precise injury underlying his common law retaliatory discharge claim.

Further weighing against a retaliatory discharge claim here is the undeniable fact that O'Connell's complaints to management regarding Kuta's misconduct were personal to O'Connell, reflecting merely a private concern between him and Continental that did not implicate any larger public concerns. *See Buechele v. St. Mary's Hosp. Decatur*, 509 N.E.2d 744, 747 (Ill. App. 1987) ("The right to file a lawsuit claiming individual injury is a purely personal right and does not involve any clearly mandated public policy."). In *Brandon*, the Seventh Circuit cited *Hamros v. Bethany Homes & Methodist Hosp.*, 894 F. Supp. 1176 (N.D. Ill. 1995), with approval for the proposition that there is "no retaliatory discharge claim for [a] plaintiff fired for exercising his rights under the Family Medical Leave Act (FMLA) since the

FMLA already prohibits retaliation and th[e] discharge presented a purely private matter between the employer and the employee." *Brandon*, 277 F.3d at 943. O'Connell's retaliatory discharge claim, to the extent it is grounded on the ADA, cannot meaningfully be distinguished from the claim rejected in *Hamros*. *See also Price v. Carmark Datsun, Inc.*, 485 N.E.2d 359, 361 (Ill. 1985) (where the plaintiff allegedly was fired for submitting a health insurance claim on his employer's group plan, holding that no retaliatory discharge claim was stated because state insurance statutes closely regulate health insurance and because "[t]he matter here is one of private and individual grievance rather than one affecting our society"); *Sallis v. Prime Acceptance Corp.*, 2005 WL 1950661, at *3 (N.D. Ill. Aug. 10, 2005) (dismissing a retaliatory discharge claim, which alleged that the plaintiff was terminated for asserting her FMLA rights, because only private interests were at stake and because FMLA's anti-retaliation provision provided an adequate alternative remedy).

O'Connell's brief argues that the retaliatory discharge claim can be grounded on the second public policy cited in the amended complaint: the public policy of ensuring that plaintiffs mitigate their damages. Doc. 34 at 7. However, O'Connell does not cite, and the court has not found, any precedent stating or even hinting that an employee's duty to mitigate the effects of workplace harassment qualifies as the kind of public policy that can support a common law retaliatory discharge claim. The lack of such precedent is not surprising. First, the mitigation-of-damages public policy, to the extent it exists, is stated at too high a level of generality to ground a retaliatory discharge claim. *See Turner*, 911 N.E.2d at 375-78. Second, the duty to mitigate affects only private interests—the individual's health—not any broader public concerns, and

cannot support a retaliatory discharge claim for that reason as well. *See Brandon*, 277 F.3d at 941; *Price*, 485 N.E.2d at 361; *Buechele*, 509 N.E.2d at 747.

## IV.     IHRA Claim

The IHRA, "adopted in 1979, is intended to secure for all individuals in Illinois freedom from unlawful discrimination in connection with employment, real estate transactions, access to financial credit, and availability of public accommodations." *Blount*, 904 N.E.2d at 6. The IHRA "consolidated what had been a patchwork of antidiscrimination law in Illinois by repealing various acts," including the Illinois Equal Opportunity for the Handicapped Act, "but incorporating their principal design, purpose or intent." *Ibid.* (internal quotation marks omitted). "To accomplish its objectives," the IHRA "created" the IDHR and the Illinois Human Rights Commission ("IHRC"). *Ibid.* "Generally, the [IDHR] investigates 'charges' brought by 'aggrieved parties' claiming 'civil rights violations,' as defined in the [IHRA]," and the IHRC "reviews [IDHR] decisions and adjudicates civil rights 'complaints.'" *Ibid.*.

The IHRA provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8–111(D). The complainant first must file a charge with the IDHR within 180 days of the civil rights violation. *See* 775 ILCS 5/7A-102(A). Once the IDHR investigates the charge and issues a report, the complainant has the option, which must be exercised within ninety days of receiving the report, of proceeding before the IHRC or commencing a civil action in court. *See* 775 ILCS 5/7A-102(D). If the IDHR fails to issue a report within 365 days, the complainant has ninety days to either proceed before the IHRC or commence a civil action. *See* 775 ILCS 5/7A-102(G)(2).

An additional layer of complexity arises where, as here, the complainant files an administrative charge with the EEOC. The EEOC and IDHR work under a cooperative agreement, under which a charge filed with the EEOC is deemed filed with the IDHR as well. 775 ILCS 5/7A-102(A-1); *see Garcia v. Vill. of Mt. Prospect*, 360 F.3d 630, 642 n.13 (7th Cir. 2004). Upon receiving a charge filed with the EEOC, the IDHR "shall notify the complainant that he or she may proceed with the [IDHR]. The complainant must notify the [IDHR] of his or her decision in writing within 35 days of receipt of the [IDHR]'s notice to the complainant and the [IDHR] shall close the case if the complainant does not do so." 775 ILCS 5/7A-102(A-1). "If the complainant proceeds with the [IDHR], the [IDHR] shall take no action until the [EEOC] makes a determination on the charge." *Ibid.* "Upon receipt of the [EEOC's] determination, the [IDHR] shall cause the charge to be filed under oath or affirmation … . At the [IDHR]'s discretion, [it] shall either adopt the [EEOC's] determination or process the charge pursuant to [the IHRA]." *Ibid.*

Failure to comply with the IHRA's exhaustion requirements warrants dismissal of an IHRA claim. *See Garcia*, 360 F.3d at 640. Defendants correctly contend that O'Connell did not properly exhaust his IHRA claim. On November 10, 2009, consistent with 775 ILCS 5/7A-102(A-1), the IDHR notified O'Connell by letter that if he wished to proceed with his charge before the IDHR, he had to notify the IDHR within 35 days of receiving the letter or his file would be closed. Doc. 34-1. O'Connell does not claim that he provided the requisite notification to the IDHR. Instead, he submits that the EEOC's right to sue letter allowed him to bring his IHRA claim in court in light of the IDHR-EEOC cooperative agreement. Doc. 25 at ¶ 160. O'Connell also submits that the IDHR's November 2009 letter and a subsequent phone

call misled him into believing that until the EEOC made its determination, he did not have to take any action to preserve his IHRA claim.  Doc. 34 at 11-13.  O'Connell's position cannot be reconciled with the IHRA's text, which plainly and expressly requires a complainant wishing to pursue his charge before the IDHR to inform the IDHR within 35 days of receiving the IDHR's letter, *see* 775 ILCS 5/7A-102(A-1), or with the IDHR's letter, which plainly says the same thing, Doc. 34-1.

Even if O'Connell had properly exhausted his administrative remedies, the IHRA claim would be dismissed as untimely.  It is undisputed that the IDHR did not issue a report on O'Connell's administrative charge.  The relevant IHRA provision states: "If the [IDHR] has not issued its report within 365 days after the charge is filed, or any such longer period agreed to in writing by all the parties, the complainant shall have 90 days to either file his or her own complaint with the [IHRC] or commence a civil action."  775 ILCS 5/7A-102(G)(2).  In circumstances where the complainant files his charge with the EEOC, the statute does not say whether the 365-day period commences when the *complainant* files the charge with the EEOC or, alternatively, when the *IDHR* files the charge after receiving the EEOC's determination.  The first view finds support in the portion of the statute providing that a charge filed with the EEOC "shall be deemed filed with the [IDHR] on the date filed with the EEOC."  775 ILCS 5/7A-102(A-1).  The second view finds support in the portion of the statute providing that the IDHR "shall take no action until the [EEOC] makes a determination on the charge" and that "[u]pon receipt of the [EEOC]'s determination, the [IDHR] shall cause the charge to be filed under oath and affirmation."  *Ibid*.

There is no need to resolve the issue here, for O'Connell's suit is untimely however the statute is read. If the 365-day period commenced when O'Connell filed his EEOC charge on September 11, 2009 (Doc 30-2), O'Connell was required to file this suit by December 10, 2010—which is 365 days plus 90 days after September 11, 2009. O'Connell filed this suit on April 5, 2011, nearly four months too late. By contrast, if the 365-day period commenced when the EEOC made its determination, which was after early January 2011, *see* Doc. 25 at ¶ 160 (alleging that the EEOC provided a right-to-sue letter less than ninety days prior to April 5, 2011), then O'Connell filed this suit too early, as the 365-day period had not expired when this suit was filed, and in fact has yet to expire. So, because O'Connell filed his IHRA claim in court either too early or too late, it would be dismissed even if he had exhausted his state administrative remedies. *See McCarrell v. Wirtz Beverage Ill., LLC*, 2010 WL 3548004, at *2 (N.D. Ill. Sept. 7, 2010).

## Conclusion

For the foregoing reasons, O'Connell's ADA discrimination claim, retaliatory discharge claim, and IHRA claim are dismissed. O'Connell's ADA retaliation claim and intentional infliction of emotional distress claim may proceed.

October 17, 2011

_____
United States District Judge